STATE OF CONNECTICUT *v.* RAPHAEL TORRES
(13382)

PETERS, C. J., HEALEY, CALLAHAN, COVELLO and SANTANIELLO, Js.

Argued December 14, 1988—decision released April 11, 1989

*Jon C. Blue,* assistant public defender, with whom, on the brief, was *Joette Katz,* public defender, for the appellant (defendant).

*Timothy J. Sugrue,* deputy assistant state's attorney, with whom, on the brief, was *Herbert G. Appleton,* assistant state's attorney, for the appellee (state).

ARTHUR H. HEALEY, J. In this case, the defendant raises four claims of error in his trial in which the jury found him guilty of murder in violation of General Statutes § 53a-54a.[1] He maintains first that the court erred

---

[1] General Statutes § 53a-54a provides: "MURDER DEFINED. AFFIRMATIVE DEFENSES. EVIDENCE OF MENTAL CONDITION. CLASSIFICATION. (a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime.

"(b) Evidence that the defendant suffered from a mental disease, mental defect or other mental abnormality is admissible, in a prosecution under

in admitting the probable cause hearing testimony of a witness, Victor Reyes, who invoked his privilege against self-incrimination and refused to testify after the state advised him that it might charge him with perjury or false statement if Reyes carried out a claimed recantation of his earlier testimony. The defendant also claims that the trial court erred in sustaining a verdict based in the main on such probable cause hearing testimony. The third claim of error is based on the trial court's restriction of the defendant's ability to impeach the declarant Reyes by (a) denying the defendant's request to have the declarant invoke his privilege against self-incrimination in front of the jury, (b) refusing to explain to the jury why the declarant of the probable cause testimony was unavailable, and (c) refusing to permit the defendant to present evidence that the declarant was advised by the state that he might be arrested for perjury or false statement if his testimony at trial repudiated his probable cause hearing testimony. Finally, the defendant claims error in the trial court's refusal to allow him to impeach the declarant by prior inconsistent statements made before the probable cause hearing, although it permitted the state to corroborate the declarant's probable cause testimony with consistent statements made before the hearing. We find error in the defendant's fourth claim and order a new trial; thus, we need not address in detail the first three claims.

The facts that the jury reasonably could have found and that are relevant to the defendant's fourth claim of error must be set out at this point and will be supplemented later as necessary. At approximately 7 a.m., on Tuesday, November 25, 1986, officers from the

subsection (a), on the question of whether the defendant acted with intent to cause the death of another person.

"(c) Murder is punishable as a class A felony in accordance with subdivision (2) of section 53a-35a unless it is a capital felony."

Hartford police department responded to a report of a body in a vacant lot at 89 Walnut Street. Upon their arrival, the officers discovered the victim's body with a hole in the chest and no signs of life. Identification found on the victim identified him as Miguel R. Maldonado of New Haven.[2] An autopsy revealed the cause of death to be a stab wound with penetration of the right lung and aorta. The medical examiner estimated the time of death at about 1 or 2 a.m. on November 25. There was a pool of blood in front of 95–97 Walnut Street and drag marks leading from the street to the embankment on the lot where the body was located.

On Tuesday, November 25, 1986, as part of their investigation, the police approached Victor Reyes, who lived at 103 Walnut Street with his family. Neither Reyes, nor any family members who were interviewed at that time, admitted to any knowledge of the apparent homicide the night before. At that time, Reyes's mother, Bonnie Sanchez, told investigators that neither she nor anyone in her family had seen the incident. At some point after November 25, however, Reyes informed the police that he had observed the homicide.[3]

On December 2, 1986, Reyes provided a description of the assailant to Detective James Malcolm of the Hartford police department. Reyes described the assailant as a dark complected Hispanic or black male, standing approximately 5 feet 9 inches tall, weighing

[2] Through fingerprints, the victim later was identified as Miguel Maldonado Rivera.

[3] On November 25, 1986, the Hartford police executed a search and seizure warrant at an apartment on Albany Avenue in Hartford inhabited by the defendant and two other people. The police seized a green army jacket with a red stain on it. The defendant told the police that the jacket was his. Elaine Pagliaro from the state forensic laboratory testified that the red stain on the jacket was caused by human blood, but that tests were inconclusive as to whether the blood type was that of the defendant or the victim. She also said the same of some blood-stained napkins seized at the same time.

160 pounds and wearing a tan jacket with a green scarf.[4] On the same day, Reyes was shown an array of five "mug shots," one being a picture of the defendant taken on the day of the murder, November 25, but Reyes did not identify any of these pictures as that of the assailant. There was testimony that Reyes was then shown "[e]very available photo" at the Hartford police department, but he failed to identify the assailant.

Reyes's next attempt at identifying the assailant occurred on January 9, 1987. Malcolm showed Reyes an array of photographs of seven Hispanic males, one of which was a photograph of the defendant taken on January 9, 1987. From this array, Reyes identified the photograph of the defendant as that of the assailant. The defendant was arrested that same day.

On February 20, 1987, a hearing was held to determine whether there was probable cause to believe that the defendant had committed the charged offense. See General Statutes § 54-46a. Reyes testified for the state at the probable cause hearing that on the night of November 25, 1986, as he looked out his window, he saw two men arguing in the street near his house on Walnut Street. One man (the victim) had something in his hand that the second man grabbed and then the second man ran across Walnut Street. The victim yelled for help and ran after the other man. Seeing that no one was coming to help, the man with the item ran back toward the victim, and when he reached the victim, he hit him with his fist, knocking the victim down. The man then picked up the victim, carried him toward the sidewalk and stabbed him once in the chest with a knife. He then threw the victim into the vacant lot. Reyes further testified that, on January 9, 1987, he had identi-

---

[4] On December 2, 1986, Reyes did identify a picture of a black man as possibly that of the assailant, but he was not positive of the identification because of a beard on the man in the picture. It was determined later that the person so identified by Reyes was in the Somers correctional facility at the time of the crime.

fied the defendant as the assailant, and he again identified the defendant as the assailant in court at the probable cause hearing. At that hearing, the court found probable cause and thereafter the defendant pleaded not guilty and elected trial by jury.

On November 17, 1987, just before the defendant's trial, Reyes told the assistant state's attorney who was to try the case and a number of other persons involved in the investigation that he had lied at the probable cause hearing about the defendant's involvement in the crime. At trial, but out of the presence of the jury, the court heard testimony that the assistant state's attorney had informed Reyes that if he were to testify at the defendant's trial and repudiate the testimony that he gave at the probable cause hearing, the state might bring perjury or false statement charges against him. Apparently, because of this, outside of the presence of the jury and with his own attorney present, Reyes invoked his fifth amendment right not to incriminate himself in the defendant's trial. Thereafter, the court found Reyes to be unavailable as a witness at the defendant's trial. Accordingly, over the defendant's objection, the court admitted the transcript of Reyes's probable cause testimony in the defendant's trial after finding that testimony to be reliable. The transcript of Reyes's testimony at the probable cause hearing was then read to the jury.

At trial, in order to impeach Reyes's probable cause hearing testimony, the defendant called Inspector Steven Oborski from the state's attorney's office. Oborski testified that he was present on November 17, 1987, when Reyes informed the assistant state's attorney that he had lied at the probable cause hearing about the defendant's involvement in the crime. To impeach Reyes's credibility further, the defendant called Reyes's mother, Bonnie Sanchez, who testified that on February 20, 1987, just after the probable cause hearing, Reyes told her that the defendant was not the person

who killed the victim. Sanchez also testified that Reyes told her on a number of occasions after the probable cause hearing that "[Torres] was not the one."

Following the defendant's impeachment of Reyes's probable cause hearing testimony, the state offered testimony to rehabilitate Reyes's credibility. On cross-examination of Sanchez, the state elicited testimony that Sanchez did not tell the police that Reyes had told her that he had lied at the probable cause hearing immediately after she found this out, but did so when the police came to her house sometime later. On cross-examination of Oborski as a witness for the defense, the state elicited testimony that, on November 4, 1987, he and another inspector went to Reyes's home and took him to their office where they met with the assistant state's attorney who was going to try the case for the state. In going over Reyes's testimony to be given at the trial, Reyes said that his testimony at trial "[would be] the same as the probable cause hearing, the same testimony." Oborski also testified that on November 17, 1987, Reyes again stated that he saw the defendant stab the victim on Walnut Street.

In addition to these proffered consistent statements, the state also offered as evidence a signed statement that Reyes gave to the police on January 9, 1987. The statement contained Reyes's description of the homicide on Walnut Street and his identification of the defendant's picture at the police station on January 9, 1987. It is the trial court's admission of this consistent written statement and two other consistent statements of Reyes made to Inspector Lawrence Skinner of the state's attorney's office, one on February 19, 1987, and the other just before the probable cause hearing on February 20, 1987,[5] and the exclusion of cer-

---

[5] In both instances, Reyes told Skinner that he saw the defendant kill the victim.

tain inconsistent statements offered by the defendant and also made before the probable cause hearing that the defendant claims as reversible error. For the reasons set forth below, we agree that the trial court erred and that a new trial is necessary.

The trial court excluded two statements offered by the defendant as inconsistent with Reyes's probable cause hearing testimony. The first was a statement by Sanchez that on the very day of the homicide, November 25, 1986, Reyes told her that the assailant was a black man wearing a long brown coat. The defendant claims this as a statement inconsistent with Reyes's identification of the defendant as the assailant because the defendant is Hispanic and because the state offered into evidence a green blood-stained army fatigue jacket that was seized from the defendant's apartment and owned by the defendant. Second, the trial court excluded a statement by Sanchez that Reyes recanted to her his photographic identification of the defendant as the assailant as soon as he returned home from the police station on January 9, 1987.

The trial court excluded these statements claiming that whether the defendant was a black man or an Hispanic man, and what Reyes told his mother "about his story" regarding the identification were "not material to this case, not at issue" and hearsay. The trial court stated that only statements of Reyes made *after* the probable cause hearing were relevant to the case.

In admitting through Sanchez the inconsistent statements made after the probable cause hearing, the trial court also asserted that the actual conversations between Reyes and Sanchez were inadmissible hearsay and that it would only admit statements by Sanchez to the effect that Reyes said that he had lied, in essence, limiting the evidence to an impeachment use. The trial court admitted these statements that Reyes

said that he had lied after the probable cause hearing on the basis that they were excepted from the hearsay rule as declarations against penal interest.[6]

The trial court, initially at least, also limited the state in introducing rehabilitative evidence, after Reyes's impeachment, to consistent statements that were made after the probable cause hearing. The state also was limited to using consistent statements for their rehabilitative value only.[7]

---

[6] The trial court's reasoning was as follows: "The Court: You can't put in Mr. Reyes' testimony through somebody else. He has taken the Fifth Amendment. I have said that I will allow you to get before the jury what you have done. If you want to reaffirm that by the fact that he told his mother on many occasions he lied, fine. You are not going to get into actual conversations between [him] and his mother. That is hearsay and he is not subjected to cross-examination."

The court allowed statements by Sanchez limited to the fact that Reyes said he had lied "because even though it was hearsay, it might be considered a declaration against penal interest," and therefore is excepted from the hearsay rule.

We note that it was inconsistent for the trial court to rule that Reyes's statements to his mother were excepted from the hearsay rule as declarations against penal interest; *State* v. *Hernandez,* 204 Conn. 377, 389, 528 A.2d 794 (1987); *State* v. *Sanchez,* 200 Conn. 721, 724, 513 A.2d 653 (1986); *State* v. *DeFreitas,* 179 Conn. 431, 452, 426 A.2d 799 (1980); see generally C. Tait & J. LaPlante, Handbook of Connecticut Evidence (2d Ed. 1988) § 11.6; but then to limit the use of the statements to an impeachment use rather than to prove the truth of the matter asserted. The reason for the exception to the hearsay rule for declarations against penal interest is that a person would not normally make a statement that could be injurious to himself or herself unless that person believed the statement to be true. See *State* v. *Bryant,* 202 Conn. 676, 692 n.16, 523 A.2d 451 (1987). If a statement fits within this exception, as the trial court seemed to find Reyes's statements to his mother because they implicated possible perjury or false statement liability for Reyes, the statements are deemed trustworthy and may be admitted for their truth. Therefore, it is inconsistent that the trial court would find Reyes's statements to fit within this exception and then limit their use to their impeachment value.

[7] The state sought to introduce evidence that Reyes was scared to testify against the defendant and that that may have been a reason for invoking his fifth amendment rights. The trial court excluded these statements as hearsay and only admitted statements relating to whether Reyes lied.

Significantly, the state's brief says: "The state does not dispute that Reyes's prior testimony [at the probable cause hearing] was *indispensable* to a finding of guilt." (Emphasis added.) In oral argument before this court, the state conceded that without Reyes's probable cause testimony, there would be insufficient evidence to support a conviction. In this case, the jury never saw or heard Reyes, the only witness to the alleged homicide. Yet, this very witness was not impeached or rehabilitated on the witness stand through the use of the prior inconsistent and consistent statements. Because the witness had invoked his fifth amendment privilege not to testify against himself, the court admitted his probable cause hearing testimony in full and thus impeachment could not have been accomplished through cross-examination and questioning of the witness but only by the introduction of statements that he had made prior to trial. We find no basis for limiting such prior statements to those that were made only after the probable cause hearing.

We acknowledge that a trial court has wide discretion in allowing prior inconsistent statements to impeach the testimony of a witness. *G & R Tire Distributors, Inc.* v. *Allstate Ins. Co.,* 177 Conn. 58, 60–61, 411 A.2d 31 (1979); *State* v. *Villafane,* 171 Conn. 644, 671, 372 A.2d 82 (1976), cert. denied, 429 U.S. 1106, 97 S. Ct. 1137, 51 L. Ed. 2d 558 (1977), overruled in part on other grounds, *State* v. *Stepney,* 191 Conn. 233, 464 A.2d 758 (1983), cert. denied, 465 U.S. 1084, 104 S. Ct. 1456, 79 L. Ed. 2d 722 (1984), *State* v. *Keating,* 151 Conn. 592, 597, 200 A.2d 724 (1964), cert. denied sub nom. *Joseph* v. *Connecticut,* 379 U.S. 963, 85 S. Ct. 654, 13 L. Ed. 2d 557 (1965). Because out-of-court inconsistent and consistent statements are hearsay, unless such statements fit within an exception to the hearsay rule, they may not be used to prove the truth of the matter asserted but may be used only to impeach or rehabilitate a witness. *State* v. *Villafane,* supra, 672, citing

3A J. Wigmore, Evidence (Chadbourn Rev.) § 1018; see *State* v. *Saia,* 172 Conn. 37, 46, 372 A.2d 144 (1976); *State* v. *Addazio,* 169 Conn. 416, 425–26, 363 A.2d 153 (1975); C. Tait & J. LaPlante, Handbook of Connecticut Evidence (2d Ed. 1988) § 7.24.3; but see *State* v. *Whelan,* 200 Conn. 743, 753, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986) ("prior written inconsistent statements, signed by the declarant, who has personal knowledge of the facts stated, when the declarant testifies at trial and is subject to cross-examination" are admissible as substantive evidence). "The purpose of impeachment is to undermine the credibility of a witness so that the trier will disbelieve him and disregard his testimony. See generally 3A Wigmore, Evidence (3d Ed. Chadbourn Rev.) § 874." *State* v. *Maldonado,* 193 Conn. 350, 362, 478 A.2d 581 (1984). Although there is a modern trend to admit prior inconsistent statements as substantive evidence, this trend is limited to those cases in which the witness is present in court and subject to cross-examination. C. McCormick, Evidence (3d Ed. 1984) § 34; G. Lilly, An Introduction to the Law of Evidence (1978) § 52. Therefore, because the trial court concluded that Reyes was unavailable as a witness in this case, to the extent that it admitted inconsistent statements that were not otherwise excluded from the hearsay rule, the trial court properly limited the use of the evidence to its impeachment use.

Once it admitted the inconsistent statements offered by the defendant, the trial court properly admitted consistent statements offered by the state to rehabilitate Reyes's credibility. See *State* v. *Pollitt,* 205 Conn. 61, 77, 530 A.2d 155 (1987); *State* v. *Edwards,* 201 Conn. 125, 155, 513 A.2d 669 (1986); *State* v. *McCarthy,* 179 Conn. 1, 18–21, 425 A.2d 924 (1979). The jury was instructed properly that these statements could only be used in the jury's assessment of Reyes's credibility and not as substantive evidence.

As the state conceded at trial, in its brief, and at oral argument, there was no reason for the trial court to limit the introduction of inconsistent and consistent statements to those that were made after the probable cause hearing. Our review of the record and transcript indicates that Reyes's identification of the defendant and his testimony were essential to the state's case. This includes the state's concession that Reyes's probable cause hearing testimony was "indispensable" to a finding of guilt. It seems incongruous, therefore, that the trial court could declare that "[w]hat he saw down at the police station, [who] he picked out, what the police told him to do, that is all *immaterial*," and "whether [the assailant] was a black man or Spanish man with a knife, that is *immaterial*." (Emphasis added.) Reyes's statement to his mother on the very day of the incident that the assailant was a black man with a long brown coat, and his assertion to his mother on the very day that he identified the defendant in the photo array that he lied are highly probative of Reyes's credibility in light of his probable cause hearing testimony. The temporal proximity of the events to the date of the crime significantly enhance their probative value. Although the trial court has broad discretion in admitting inconsistent and consistent statements to impeach and rehabilitate a witness, our review of the record and transcript reveals no reason for the exclusion of the defendant's proffered inconsistent statements in this case.

While the state claims that the trial court's exclusion of the inconsistent statements may have been an evidentiary error, thus leaving the defendant with the burden of proving harm; see *State* v. *Jones*, 205 Conn. 723, 732, 535 A.2d 808 (1988), citing *State* v. *Ruth*, 181 Conn. 187, 196–97, 435 A.2d 3 (1980); this error escalated to constitutional proportions when the trial court, while limiting the defendant to inconsistent statements

made after the probable cause hearing on February 20, 1987, admitted three consistent statements offered by the state that were all made before the probable cause hearing.[8] The exclusion of the defendant's proffered inconsistent statements while admitting the state's consistent statements was not evenhanded and thus violated the defendant's due process right to a fair trial. Thus "the burden is on the state to prove that this error was harmless beyond a reasonable doubt." *State* v. *Jones,* supra, 731, citing *Chapman* v. *California,* 386 U.S. 18, 24, 87 S. Ct. 824, 17 L. Ed. 2d 705, reh. denied, 386 U.S. 987, 87 S. Ct. 1283, 18 L. Ed. 2d 241 (1967).

The state also contends that the trial court's error in failing to admit the inconsistent statements offered by the defendant was harmless. The state maintains that the information in the two excluded inconsistent statements already was before the jury and thus the error is not a reversible one.

It is true that the general information contained in the excluded statements was presented to the jury by other means. Oborski testified that Reyes told him that he had lied at the probable cause hearing. Sanchez also testified that every time she spoke with Reyes about the murder after the probable cause hearing he said the defendant was not the person who killed the victim. Malcolm testified that Sanchez told him on November 17, 1987, that Reyes had lied. Malcolm also testified that Reyes initially described the assailant as a black man or a dark complected Hispanic man, that Reyes tentatively identified a black man as the assailant, and that Reyes was unable to identify the defendant when shown his picture in an array with five pictures on

---

[8] These consistent statements were Reyes's signed statement, dated January 9, 1987, identifying the defendant as the assailant, and Reyes's two statements to Skinner on February 19 and 20, 1987, that his testimony at trial would be consistent with his probable cause hearing testimony.

December 2, 1986. Also, Oborski testified that Sanchez told him on November 17, 1987, that the men fighting in the street on November 25, 1986, were a black man and a white man.

Notwithstanding this information, the exclusion of the inconsistent statements denied the defendant a fair trial. Through the excluded statements, the defendant wanted to show that on the *same* day as the murder, Reyes told Sanchez that the assailant was a black man wearing a brown coat. He further wanted to show that on the *same* day that Reyes identified the defendant as the assailant, Reyes told Sanchez that the identification was wrong. The proximity in time of the murder and Reyes's description to Sanchez of the assailant, and of Reyes's identification of the defendant and his recantation of that identification makes this evidence highly probative in this case, where both Reyes's description and identification play a central role in the defendant's conviction. See *Thomas* v. *Ganezer,* 137 Conn. 415, 420, 78 A.2d 539 (1951). This is particularly so in light of the state's evidence that was admitted to support Reyes's identification on the *same* day that it occurred. Under our state and federal constitutions, " '[t]he right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations. The rights to confront and cross-examine witnesses and to call witnesses in one's own behalf have long been recognized as essential to due process.' " *State* v. *Mastropetre,* 175 Conn. 512, 520, 400 A.2d 276 (1978), quoting *Chambers* v. *Mississippi,* 410 U.S. 284, 294, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973); *State* v. *Fernandez,* 198 Conn. 1, 15, 501 A.2d 1195 (1985). "The ' "denial of due process is the failure to observe that fundamental fairness essential to the very concept of justice. In order to declare a denial of it we . . . must find that the absence of that fairness fatally infected

the trial; the acts complained of must be of such quality as necessarily prevents a fair trial." *Lisenba* v. *People of State of California,* 314 U.S. 219, 236, 62 S. Ct. 280, 86 L. Ed. 166 [1941], rehearing denied, 315 U.S. 826, 62 S. Ct. 620, 86 L. Ed. 1222 [1942].' *State* v. *Griffin,* 175 Conn. 155, 160, 397 A.2d 89 (1978)." *State* v. *Binet,* 192 Conn. 618, 634, 473 A.2d 1200 (1984).

By denying the defendant in this case the opportunity to introduce highly probative, inconsistent statements to challenge the credibility of the key witness, the trial court denied the defendant the opportunity to confront the witnesses against him. More importantly, the defendant was denied his "right to a *fair* opportunity to defend against the State's accusations" because the standards set down by the trial court for the admission of impeachment and rehabilitative evidence differed between the state and the defendant. While the state was permitted to introduce consistent statements made prior to the probable cause hearing, and thus much closer in time to the crime, the defendant was not permitted to introduce inconsistent statements. Without question, this action by the trial court denied the defendant his constitutional right to a fair trial. Although the excluded evidence may be, to some extent, cumulative, its otherwise high probative value dictates that it should have been included in the fact-finding process at trial. We are not persuaded that its exclusion was harmless error.

Having found reversible error on this claim, we must set aside the judgment and order a new trial and we need not look to other claims of error. It is likely, however, that, in the event of a new trial, the trial court will be faced with an issue raised in one of the defendant's other claims in this appeal. The defendant claimed error in the trial court's admission of Reyes's probable cause hearing testimony as substantive evidence. We note here that this court and the United States

Supreme Court have declared that prior testimony of an unavailable witness is admissible in a subsequent trial as an exception to the hearsay rule. *Ohio* v. *Roberts,* 448 U.S. 56, 67, 100 S. Ct. 2531, 65 L. Ed. 2d 597 (1980); *California* v. *Green,* 399 U.S. 149, 165, 90 S. Ct. 1930, 26 L. Ed. 2d 489 (1970); *State* v. *Parker,* 161 Conn. 500, 503–504, 289 A.2d 894 (1971). As long as the trial court finds the requisite "indicia of reliability" in the former testimony, such as the opportunity to cross-examine the declarant fully, the testimony is admissible. See C. McCormick, supra, § 254, p. 759; see generally comment, "Admission of Grand Jury Testimony Under the Residual Hearsay Exception," 59 Tul. L. Rev. 1033 (1985).

In sum, the trial court's erroneous restriction on the use of credibility evidence to statements that were made after the defendant's probable cause hearing on February 20, 1987, compounded by the trial court's enforcement of that restriction against the defendant but not against the state, denied the defendant his due process right to a fair trial. The defendant's conviction cannot stand.

There is error, the judgment is set aside and a new trial is ordered.

In this opinion the other justices concurred.