## STATE OF CONNECTICUT *v.* LEEROY HARRIS
### (AC 17081)

O'Connell, C. J., and Lavery and Landau, Js.

Argued January 27—officially released May 26, 1998

*Alexander H. Schwartz*, special public defender, for the appellant (defendant).

*Susann E. Gill*, senior assistant state's attorney, with whom, on the brief, were *Donald A. Browne*, state's attorney, and *John C. Smriga*, senior assistant state's attorney, for the appellee (state).

*Opinion*

LANDAU, J. The defendant, Leeroy Harris, appeals from the judgment of conviction, rendered after a jury trial, of murder in violation of General Statutes § 53a-54a.[1] On appeal, the defendant claims that the trial court (1) improperly permitted the state to comment indirectly on the failure of the defendant to testify, and (2) abused its discretion (a) in excluding evidence of alleged third party culpability and (b) in admitting testimony about a prior consistent statement by a witness for the state. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On May 14, 1994, Carl Nicholson left his home on Arctic Street in Bridgeport to buy groceries. He lived there with Stacy Corbett and five children, Erica, Eric,

---

[1] General Statutes § 53a-54a (a) provides in relevant part: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person . . . ."

Shawn, Corey and Carla. When he left, he told ten year old Erica, the eldest child, to close the door. As he stepped out onto the porch, Nicholson had a conversation with the defendant, whom he knew as a neighbor, telling him that Corbett had left the children alone for two days and that he was going to the grocery store. The defendant told Nicholson that he had some toys in the attic for the children, and Nicholson replied that the defendant should save the toys for the morning because the children were going to bed. The defendant asserted that he was going to get the toys for the children.

Shortly thereafter, the defendant appeared at the door of the Corbett residence and told Erica that her father said to come with him to get some toys. Eric, who recognized the defendant, wanted to go along, but the defendant said, "Only Erica." Erica left with the defendant, who beat and choked her, carried her through an alleyway, threw her over a fence into her backyard, where he stabbed her in the face and neck, piercing her jugular vein and causing her death.[2] The defendant then went to the one of the victim's neighbors and told them there was a body in the backyard. Other facts will be discussed as pertinent to issues in the case.

I

The defendant claims that the state's closing argument contains two impermissible indirect comments on his failure to testify. Specifically, the defendant claims that the state posed two rhetorical questions to the jury that "pointed directly and starkly at [the defendant] and asked him, and only him, for an explanation."[3]

---

[2] The assistant medical examiner was unable to determine the order in which Erica sustained her injuries.

[3] The defendant did not object to these comments until immediately after the trial court's instruction to the jury when he argued that they came "dangerously close to a comment on the accused's failure to testify." The

The fifth amendment to the United States constitution, applicable to the states through the fourteenth amendment, "forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." *Griffin* v. *California*, 380 U.S. 609, 615, 85 S. Ct. 1229, 14 L. Ed. 2d 106 (1965). This does not mean that the state is prohibited from calling to the jury's attention any portion of the evidence that stands uncontradicted; see *State* v. *Marra*, 222 Conn. 506, 534, 610 A.2d 1113 (1992); or commenting "on the overall quality of the defendant's evidence . . . ." *State* v. *Magnotti*, 198 Conn. 209, 220, 502 A.2d 404 (1985).

In determining whether an indirect comment infringes on the defendant's constitutional privilege against self-incrimination, we have adopted the following test: " 'Was the language used manifestly intended to be, or was it of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify?' " *State* v. *Evans*, 165 Conn. 61, 72, 327 A.2d 576 (1973), citing *United States ex rel. Leak* v. *Follette*, 418 F.2d 1266, 1269 (2d Cir. 1969), cert. denied, 397 U.S. 1050, 90 S. Ct. 1388, 25 L. Ed. 2d 665 (1970).

The following additional facts concerning portions of the state's closing argument are necessary before we can review the defendant's claims. The state called Henry Lee, the state's chief criminalist and director of the state forensic laboratory, as its expert witness. A portion of Lee's testimony concerned a bloodstain found on the defendant's sneaker. According to Lee's

---

defendant did not request the court to take any curative action at that point. Instead he requested the court to reserve ruling until after the verdict. The court agreed. After the verdict, the request was included in a motion to set the verdict aside, which was denied. On appeal, the state did not claim the issue was not properly preserved. This court assumes, without deciding, that the issue was preserved.

expert opinion, the bloodstain was caused by blood spatter rather than contact transfer. This was telling because although the defendant may have acquired a contact stain simply by touching blood,[4] a spatter stain required that the blood be airborne prior to contact. Furthermore, Nicholson testified, without contradiction, that he noticed that between the time he saw the defendant on the porch and when he returned from the grocery store, the defendant had changed his shirt.

During its final argument, the state asked several rhetorical questions related to the testimony of Lee[5] and Nicholson.[6] We conclude that the state's questions would not naturally and necessarily be taken as comments on the defendant's failure to testify and that the state did not intend them to have such an effect. In the state's closing argument, the prosecutor first argued, "Well, how did it get there, then?" which clearly refers to Lee's explanation of how the bloodstain got on the defendant's sneaker, i.e., spatter as opposed to surface

---

[4] Lee was able to determine only that the stain was caused by human blood. He could not determine whether it was Erica's blood because the sample was too small.

[5] The prosecutor argued in part, "On that basis you're asked to just reject it. That's not Erica's blood. Well, I would suggest to you when you review the testimony of Dr. Lee that he does not exclude that as a possibility. *Well, how did it get there then? How did blood get on the shoes?* Well, you know, [the defendant is] in that area. I mean he's around there. We know there's some blood. Maybe it's just blood that got on his shoe, you know, while he's walking around there. And that's where another thing comes in that Dr. Lee said. He said that this is not surface to surface transfer. It's spatter. Okay. That means that it somehow became airborne and landed on the shoe and then produced that characteristic pattern and a little tail where it trails off after it hits. That tells you it's a spatter." (Emphasis added.)

[6] The prosecutor argued in part: "The only evidence in this case about the defendant's clothing is that there was a change of shirts. *Now, why would you do that?* Does that—now, does that prove that he committed the murder? No. Is this one more thing? Which direction is it pointing at? Somebody else? Is it pointing at that we're asking you to jump to conclusions? It's one more thing that points on the defendant. It's one more thing that you need to see how it meshes with the rest of the evidence in this case." (Emphasis added.)

to surface contact, rather than calling on the defendant to explain its origins. Therefore, that statement would not have been naturally and necessarily interpreted as a comment on the defendant's failure to testify.

The defendant's second challenge is to the question: "[W]hy would you do that?" In effect, the state was asking what would lead a person to change shirts during a brief space of time. One answer is a guilty conscience and a desire to hide evidence. The question does not point to the defendant's decision not to testify, but asks the jurors to refer to their knowledge of human nature to ascertain an answer to the question. Immediately after asking the question, the state pointed out and conceded that the evidence alone is not dispositive of the defendant's guilt. It is but one fact from which the jury could draw an inference of guilt. We conclude that the rhetorical questions posed by the prosecutor would not naturally and necessarily be interpreted as a comment on the defendant's failure to testify.[7]

[7] Even if we were to view either of the challenged remarks as indirect comments on the defendant's failure to testify, the impropriety is harmless beyond a reasonable doubt. See *Chapman* v. *California*, 386 U.S. 18, 24, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967). First, the trial court charged the jury that it could not draw an unfavorable inference from the defendant's failure to testify and, absent a fair indication to the contrary, we must presume the jury followed this instruction. See *State* v. *Baskins*, 12 Conn. App. 313, 319–20, 530 A.2d 663, cert. denied, 205 Conn. 811, 532 A.2d 586 (1987). Second, defense counsel presumably did not view the remarks as so prejudicial that his client's right to a fair trial was seriously jeopardized; see *State* v. *Negron*, 221 Conn. 315, 330, 603 A.2d 1138 (1992); because he did not object until after the trial court's charge and requested that the court hold its ruling in abeyance until after the verdict. Further, the defendant did not ask the trial court to give a curative instruction to avert any prejudice that may have resulted from the allegedly improper remarks of the state's attorney. Where prejudice to the defendant could have been remedied by the court's curative instruction, defense counsel cannot opt for a new trial instead of a curative instruction, as if the two were interchangeable. See *State* v. *Hawthorne*, 176 Conn. 367, 373–74, 407 A.2d 1001 (1978); *State* v. *McNellis*, 15 Conn. App. 416, 438, 546 A.2d 292, cert. denied, 209 Conn. 809, 548 A.2d 441 (1988).

## II

### A

The defendant claims that the trial court improperly exercised its discretion by excluding evidence that he asserts implicated another in the death of Erica.[8]

The following additional facts apply to the defendant's claim. On the night of the homicide, the defendant told several individuals that he had seen an old white man with gray hair driving a green Oldsmobile. He claimed that he observed the man fighting with a black female in the car, dragging her from the car, banging her head against the car and dumping her body over the fence. The defendant also gave this information to the police. As a result, the police stopped a green Oldsmobile with a white driver and a black female passenger about one block from the crime scene, between one hour and one and one-half hours after Erica's body was found. The driver was young, blond, tall and thin.[9] A knife and a gun were found in the car. The knife was tested and no evidence of blood was found on it. Blood was found under the driver's fingernails, which the driver claimed was menstrual blood from his passenger,

---

[8] The defendant also puts forth a "fair trial" argument in that he posits that Nicholson testified that the defendant told him that a green car had driven up to the area of the Corbett home, that an old, white, gray haired man pulled a woman out of the car, banged her head on the car and threw the body over the fence. The defendant maintains that because the state was permitted to demonstrate this fact to the jury, the defendant should not be excluded from offering evidence of a third party suspect.

[9] The defendant never presented evidence concerning his third party claim. Knowledge regarding notice of the evidence came from representations of counsel in arguing the motion in limine and the police incident report marked as an exhibit for identification. Although representations of counsel are not evidence; *State* v. *Tillman*, 220 Conn. 487, 496, 600 A.2d 738 (1991), cert. denied, 505 U.S. 1207, 112 S. Ct. 3000, 120 L. Ed. 2d 876 (1992); the trial court relied on these uncontroverted representations in its ruling. In the police incident report, the driver's date of birth is April 20, 1970, and he is described as "white male, 6'4", 150 lb., light, fair complex, blue eyes, blonde hair, slender build."

with whom he had engaged in sexual activity. The driver's explanation was corroborated by the female passenger.

The state moved in limine to exclude defense evidence regarding the vehicle stop. The state argued that there was no connection between the stop or the occupants of the vehicle and the murder, and that admitting the evidence would create confusing collateral issues for the jury. The defendant maintains that the state opened the door to this area of inquiry in its direct examination of Nicholson and another witness[10] and, further, that there were sufficient similarities between the defendant's version of the incident and the vehicle stop to warrant admission of these facts in evidence. The trial court granted the state's motion in limine, finding that there was insufficient evidence that directly connected the third party to the crime charged, that there was no connection between the car and the crime, and that the prejudicial value of the evidence would outweigh its relevance and it would be a waste of time.[11]

"Both this state and other jurisdictions have recognized that a defendant may introduce evidence which indicates that a third party, and not the defendant, committed the crime with which the defendant is charged. . . . The defendant, however, must show some evidence which *directly* connects a third party to the crime

---

[10] During direct examination, Nicholson and the other witness testified, not in response to a direct question on the issue but in narrative, as to what the defendant told them about events on the night Erica was murdered. The testimony was not admitted for the truth of the matter asserted.

[11] "I'm going to grant the motion to exclude that . . . I'll find that this would only lead to extremely confusing side issues. . . . There appears to be no connection with this car to the location of this crime . . . nor of either of the occupants found in the car to the location of this crime. . . . Moreover, the description of the knife appears dissimilar, in addition to there being no blood found on the knife. . . . I do think the prejudicial value would far outweigh the relevance . . . it would lead to much confusion . . . as well as a waste of time."

with which the defendant is charged . . . . It is not enough to show that another had the motive to commit the crime . . . nor is it enough to raise a bare suspicion that some other person may have committed the crime of which the defendant is accused." (Citations omitted; emphasis added.) *State* v. *Echols*, 203 Conn. 385, 392, 524 A.2d 1143 (1987).

The admissibility of evidence of third party culpability is governed by the rules relating to relevancy. Id., 393. " 'No precise and universal test of relevancy is furnished by the law, and the question must be determined in each case according to the teachings of reason and judicial experience.' *Pope Foundation, Inc.* v. *New York, N.H. & H. R. Co.*, 106 Conn. 423, 435–36, 138 A. 444 (1927); *State* v. *Towles*, 155 Conn. 516, 523, 235 A.2d 639 (1967). The trial court has wide discretion in its rulings on evidence and its rulings will be reversed only if the court has abused its discretion or an injustice appears to have been done. *State* v. *Echols*, supra [203 Conn. 393]." *State* v. *Boles*, 223 Conn. 535, 549, 613 A.2d 770 (1992).

The flaw in the defendant's claim is that none of the proffered evidence directly connected the vehicle or its occupants with the commission of the crime. While the evidence proffered during the hearing on the motion in limine, held outside the presence of the jury, demonstrated that there was a car similar in description to the one identified by the defendant in the vicinity of the crime scene about one hour to one and one-half hours after the crime, it went no further. The driver of the vehicle was Caucasian, young, blond and thin; the female passenger, an alleged prostitute, corroborated the driver's activity. It would be speculative to draw from the proffered evidence an inference that these people or the vehicle were connected to Erica's homicide.

"Ordinarily, evidence concerning a third party's involvement is not admissible until there is some evidence which directly connects that third party with the crime." *State* v. *Kinsey*, 173 Conn. 344, 347–48, 377 A.2d 1095 (1977). Unless that direct connection exists, it is within "the sound discretion of the trial court to refuse to admit such evidence when it simply affords a possible ground of possible suspicion against another person." (Internal quotation marks omitted.) *State* v. *Payne*, 219 Conn. 93, 117, 591 A.2d 1246 (1991). Evidence of a possible motive is insufficient to establish relevancy. See *State* v. *John*, 210 Conn. 652, 670–71, 557 A.2d 93, cert. denied, 493 U.S. 824, 110 S. Ct. 84, 107 L. Ed. 2d 50 (1989). Moreover, "[t]he trial court's ruling on the relevancy of third party inculpatory evidence will be reversed on appeal only if the court has abused its discretion or an injustice appears to have been done." *State* v. *Payne*, supra. After reviewing the record, we conclude that the trial court did not abuse its discretion in finding that the defendant's proffered evidence was not connected to the victim's death and in ruling as it did.[12]

---

[12] In view of our analysis of the defendant's claim, we necessarily conclude that the defendant was not deprived of his constitutional right to a fair trial. See *State* v. *Kelly*, 208 Conn. 365, 376, 545 A.2d 1048 (1988). Relevancy is an evidentiary question and "[e]very evidentiary ruling which denies a defendant a line of inquiry to which he thinks he is entitled is not constitutional error." *State* v. *Vitale*, 197 Conn. 396, 403, 497 A.2d 956 (1985). The defendant has placed a constitutional label on a nonconstitutional claim. See *State* v. *Gooch*, 186 Conn. 17, 18, 438 A.2d 867 (1982). "The defendant's rights to confront and cross-examine witnesses and to present a defense do not give him the right to have admitted any evidence he chooses." *State* v. *Negron*, 221 Conn. 315, 328, 603 A.2d 1138 (1992). In the exercise of his rights, the defendant, as well as the state, must comply with the established rules of evidence and procedure. See *State* v. *Kemp*, 199 Conn. 473, 479, 507 A.2d 1387 (1986). We find no merit in the defendant's claim.

The defendant's claim that the state opened the door to the inquiry and, therefore, the defendant was entitled to present evidence of the vehicle stop is of equal merit. "The doctrine of opening the door cannot, of course, be subverted into a rule for injection of prejudice. *United States* v. *Lum*, 466 F. Sup. 328, 335 [(D. Del.), aff'd, 605 F.2d 1198 (3d Cir. 1979)], quoting *United States* v. *Winston*, 447 F.2d 1236, 1240 (D.C. Cir. 1971)." (Internal quotation

## B

Finally, the defendant claims that the trial court improperly exercised its discretion in admitting a prior consistent statement made by Eric Corbett, the victim's seven year old brother, who was a state's witness. The defendant maintains that Eric's statement on the night of the crime identifying the defendant as the person who took his sister away should not have been admitted because the state induced an uncertainty in Eric's in-court identification, which then led to the admission of Eric's prior consistent statement. The state argues that the factual premise on which the defendant bases his claim, that Eric's prior statement was introduced to bolster an alleged uncertainty in his in-court identification, is false. The state claims that the statement was introduced to rebut the suggestion, made by the defense, that Eric's testimony was the product of numerous conversations he had with such persons as his mother, the police, the prosecutor and social workers, rather than of his memory. The state sought to refute this contention by introducing evidence of the statement Eric made shortly after his sister's body was discovered and before anyone would have had an

marks omitted.) *State* v. *Glenn,* 194 Conn. 483, 499, 481 A.2d 741 (1984). The state never delved into the issue of a possible third party culprit. In fact, the state objected to the subject when defense counsel attempted to ask questions on cross-examination of Nicholson and the other witness. Although Nicholson did relate the defendant's claims on the night of the homicide, the testimony was in the nature of a narrative of the night's events. The second witness' testimony did not include the defendant's description of the car or its occupants. Even if we were to assume, without deciding, that the state was deemed to have opened the door, that does not mean that the trial court abused its discretion in excluding the evidence. While a court may determine that the balance of equities requires that a party be able to explore an issue opened up by the other side, the court must be free to restrict that evidence due to its lack of probative value and potential for delay and confusion. The trial court found that producing evidence of a motor vehicle stop where there was no evidence connecting the vehicle's occupants to the homicide was a waste of time. Rather than advancing the truth seeking process, the admission of this evidence would have derailed it.

opportunity to influence his recollection of the evening's events. Moreover, the state asserts that the statement was admissible to rehabilitate the witness following the defendant's attempted impeachment of Eric with a prior inconsistent statement.

The following additional facts are necessary for purposes of our analysis. At the time of the trial, Eric was eight and one-half years old; at the time of the homicide, he was seven. Eric recognized the defendant when he came to the door and told Erica that her father said that it was all right to come with him. When he was asked at trial if he saw the defendant in the courtroom, Eric initially testified, "He's not here, right?" Then he testified that there was only one person in the room who looked like the defendant and pointed to the defendant, indicating he was the man who came for his sister. When asked if he was sure of his identification, Eric said that he was not. On cross-examination, Eric was asked a series of questions concerning the people with whom he had spoken about the death of his sister,[13]

[13] The following colloquy took place during the defendant's cross-examination of Eric.

"Q. Do you remember Carl talking to you that night?

"A. No.

"Q. You don't remember that at all?

"A. No.

"Q. Okay. Do you remember that night if—that's withdrawn. Have you talked to, say, that man right here about this case?

"A. Yeah.

"Q. Yeah. Okay. He brought you down to his office. Okay. And who else have you talked to about coming to court and testifying?

"A. I talked to Janet a little bit.

"Q. Uh-huh. Who is that?

"A. Janet Ahorn, at the back.

"Q. She's in the back there? That's your social worker?

"A. Yes.

"Q. Okay. Who else have you talked to?

"A. My foster mother a little bit.

"Q. You've talked to your foster mother. That's right. Talk to Stacy at all?

"A. A little bit.

"Q. A little bit. So, you talked to a lot of people a little bit. Okay. Did you talk to anybody in a police uniform about the case?

and that, at the probable cause hearing, he had pointed to his uncle when asked to identify the defendant.

Later, outside the presence of the jury, the state made known its intention to introduce testimony of a detective who had responded to the scene shortly after Erica's body was found. The detective would testify that he had asked Eric if he knew what had happened to his sister and that Eric had replied that the "fat man" came for her. Eric also told the detective that he knew where the fat man lived and led the detective out of the house, down the street and pointed to the defendant's residence.

It is beyond question that the state offered the detective's testimony, not for its truth, but to corroborate Eric's in-court identification of the defendant. The state argued: "The theory, Your Honor, that I would offer is that during the cross-examination of Eric, the cross-examination, among other things, sought to undermine the memory of Eric." The defendant argued[14] that Eric's testimony had not been challenged for bias, interest or motive and that the court should consider the reliability of the testimony.[15]

After hearing arguments, the court ruled that the proposed testimony was admissible. It found that there had been "extensive cross-examination as to the possibility of a taint or coaching and the accuracy of the

"A. No.

"Q. Okay. Talk to anybody that's called a 'detective' about the case?

"A. No."

[14] The trial court reserved ruling until the defendant had a chance to review cases offered by the state for legal support and took up the point again thereafter. For our purposes, we have consolidated the argument.

[15] Defense counsel stated: "And we are talking about the reliability of a child testifying, or pointing out something. Police were around. We have social workers around. We have—we don't know the influence of the child in what manner he was—he was coached. And it is clear to me, in reading the statement, that he was indeed coached."

witness' memory concerning the identification, including cross-examination concerning a misidentification during a probable cause hearing in which [Eric] identified his uncle." In addition, the trial court determined that the statement was given before there would have been an opportunity to coach the witness and that the relevance of the proposed evidence far outweighed any prejudicial impact it might have. The trial court also informed the defendant that it would give a cautionary instruction, which it did immediately following the detective's testimony, that the jury was to use this evidence only on the issue of Eric's credibility.[16]

Ordinarily, prior consistent statements of a witness are not admissible, whether offered for their truth or merely as corroboration of the witness' testimony at trial. The rationale for excluding this evidence is relevancy. In the normal course of events, the witness' story is not made more probable or more trustworthy by any number of repetitions of it. *State* v. *Valentine*, 240 Conn. 395, 412–13, 692 A.2d 727 (1997).

Circumstances exist, however, in which the fact that the witness made a statement consistent with his or her trial testimony is probative of credibility. Exceptions to the general rule of exclusion, therefore, exist to cover such circumstances. Major exceptions include using the prior consistent statement to rehabilitate a witness who has been impeached by a suggestion of bias or interest arising subsequent to the prior statement; see *State* v. *Jeffrey*, 220 Conn. 698, 713–14, 601 A.2d 993 (1991), cert. denied, 505 U.S. 1224, 112 S. Ct. 3041, 120 L. Ed. 2d 909 (1992); by a suggestion of recent contrivance; see *State* v. *Dolphin*, 178 Conn. 564, 568 n.5, 424 A.2d 266 (1979); by a charge of faulty recollection; see *State* v. *Anonymous (83-FG)*, 190 Conn. 715, 729, 463 A.2d 533 (1983); or by a prior inconsistent statement. See

---

[16] During its charge, the trial court also reminded the jury of this limitation.

*State* v. *Torres*, 210 Conn. 631, 641, 556 A.2d 1013 (1989). Whether the circumstances support the admission of this evidence is left to the discretion of the trial court. See *State* v. *McCarthy*, 179 Conn. 1, 18, 425 A.2d 924 (1979).

Contrary to the defendant's argument on appeal, the detective's testimony concerning Eric's prior statements was not admitted to bolster any weakness in Eric's testimony created by the state. The trial court found, and we agree, that the detective's testimony was admitted to refute the suggestion that Eric's testimony was the product of outside influences, such as police or social workers. Because Eric's statement to the detective occurred shortly after his sister's body was found and, thus, before anyone would have the opportunity to taint his recollection, the detective's testimony was highly relevant to Eric's credibility. " 'A consistent statement, at *a time prior* to the existence of a fact said to indicate bias, interest, or corruption, will effectively explain away the force of the impeaching evidence; because it is thus made to appear that the statement in the form now uttered was independent of the discrediting influence.' 4 [J.] Wigmore, Evidence (Chadbourne Rev. [1972]) § 1128, p. 268." (Emphasis in original.) *State* v. *Dolphin*, supra, 178 Conn. 571. The suggestions that Eric had been coached and that his memory had been muddied by numerous conversations, together with the challenges to his recollection, were appropriately refuted by the admission of the detective's testimony. We conclude that the trial court properly exercised its discretion.

The judgment is affirmed.

In this opinion the other judges concurred.