### STATE OF CONNECTICUT *v.* DARYL VALENTINE (15033)

Callahan, C. J., and Borden, Berdon, McDonald and Peters, Js.

Argued October 31, 1996—officially released April 15, 1997

*G. Douglas Nash,* public defender, for the appellant (defendant).

*Leon F. Dalbec, Jr.,* assistant state's attorney, with whom, on the brief, were *Michael Dearington,* state's

attorney, and *Michael A. Pepper*, assistant state's attorney, for the appellee (state).

*Opinion*

BORDEN, J. The dispositive issue in this appeal is whether the trial court properly excluded extrinsic evidence of a prior inconsistent statement that had been offered to impeach the testimony of an eyewitness that the defendant had fatally shot two victims and wounded a third victim. The defendant, Daryl Valentine, appeals[1] from the judgment of conviction, following a jury trial, of murder in violation of General Statutes § 53a-54a (a),[2] criminal attempt to commit assault in the first degree in violation of General Statutes §§ 53a-49 (a) (2)[3] and 53a-59 (a) (1),[4] and carrying a pistol without

---

[1] The defendant appealed to this court pursuant to General Statutes § 51-199 (b) (3).

[2] General Statutes § 53a-54a provides in relevant part: "Murder. (a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime. . . ."

[3] General Statutes § 53a-49 provides in relevant part: "Criminal attempt: Sufficiency of conduct; renunciation as defense. (a) A person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime, he . . . (2) intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime. . . ."

[4] General Statutes § 53a-59 provides in relevant part: "Assault in the first degree: Class B felony: Nonsuspendable sentences. (a) A person is guilty of assault in the first degree when: (1) With intent to cause serious physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument . . . ."

a permit in violation of General Statutes § 29-35.[5]

On appeal, the defendant challenges several of the trial court's evidentiary rulings and the court's denial of his motion to dismiss. Specifically, the defendant claims that the trial court improperly: (1) excluded extrinsic evidence that had been offered to impeach the testimony of the state's witness, Christopher Roach, that he saw the defendant shoot the victims; (2) violated the defendant's constitutional rights by limiting cross-examination into Roach's alleged motive to lie; (3) excluded the videotaped statement of a witness, Kristina Higgins, that had been offered to impeach her prior statement to the police that the defendant was the shooter; (4) excluded other extrinsic evidence that had been offered to impeach Higgins' prior statement to the police; (5) denied the defendant's motion to dismiss, which was based on the police department's failure to preserve the photograph of someone identified by a witness, Byron McFadden, as having features similar to those of the shooter; (6) excluded McFadden's statement to the police; (7) violated the defendant's constitutional rights by interrupting cross-examination of a witness, Regina Coleman; and (8) excluded hearsay evidence regarding Coleman's alleged bias toward the police. Because we agree with the defendant that the trial court committed harmful error in excluding extrinsic evidence that had been offered to impeach Roach regarding his identification of the defendant as the shooter, we reverse the judgment of the trial court and order a new trial.

The jury reasonably could have found the following facts. On September 21, 1991, at approximately 2:40

[5] General Statutes § 29-35 provides in relevant part: "Carrying of pistol or revolver without permit prohibited. Exceptions. (a) No person shall carry any pistol or revolver upon his person, except when such person is within his dwelling house or place of business, without a permit to carry the same issued as provided in section 29-28. . . ."

a.m., Andrew Paisley, Hury Poole, and Roach arrived together at the Athenian Diner, located on Whalley Avenue in New Haven. The diner was busy, and a crowd of people were waiting outside. As Roach approached the front of the diner, he saw people fighting on the steps of the diner. Moments later, the defendant came around from the side of the diner and fired several gunshots that hit and fatally wounded Paisley and Poole. The defendant then ran to a parked car and jumped into its front passenger seat. Roach followed him and approached the driver's side of the parked car. As Roach leaned toward the driver's side window, the defendant pushed the driver back and shot Roach twice in the forearm. Roach fell back, and the car sped away.[6]

I

The defendant first claims that the trial court improperly excluded extrinsic evidence that had been offered to impeach Roach's testimony identifying the defendant as the shooter. Specifically, the defendant claims that a defense witness, Crystal Greene, should have been allowed to testify that Roach had told her that he did not know the identity of the shooter, but was accusing the defendant because somebody had to "pay the price" for the shootings. The defendant claims that the exclusion of this evidence violated his federal and state constitutional rights to confrontation and to present a defense, and also violated state evidentiary rules. The defendant further argues that because Roach was the state's key identification witness whose credibility was a critical issue in the case, the exclusion of this evidence was harmful error requiring reversal. We conclude that the trial court's ruling was an abuse of discretion constituting harmful error. We need not consider, therefore, whether the ruling violated the defendant's constitutional rights.

---

[6] Roach could not identify the driver of the car, and no evidence was introduced at trial as to the driver's identity.

The following facts are relevant to this claim. When Roach was interviewed by the police on the morning of the murders, he was uncooperative and said that he had not seen who had shot the victims. Two days after the incident, he again spoke to the police and refused to give a formal statement. One week later, Roach gave the police a formal statement in which he said that he had been drunk on the night of the murders, that he had "blacked out" from drinking, and that he had not seen who had shot his two friends.[7]

In February, 1993, however, Roach gave another statement to the police in which he admitted that his previous statements had been lies. He stated that although he had been drinking on the night of the murders, he had not blacked out and had in fact been aware of what had occurred. He said that he had seen the defendant shoot Paisley and Poole, then run and jump into the passenger seat of a parked car. According to his statement, as Roach approached the driver's side of the car, the defendant shot him in the forearm from inside the car. Roach explained that he had lied to the police because he was afraid of the defendant. In March, 1993, Roach was shown a photographic array by the police and identified the defendant's photograph as that of the shooter.

At trial, Roach was the only witness to identify the defendant as the shooter.[8] During direct examination

[7] This statement was transcribed, but never signed by Roach. The audiocassette tape of the statement was introduced at trial under the doctrine of *State* v. *Whelan*, 200 Conn. 743, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986), and its progeny. Under *Whelan*, a prior written inconsistent statement may be used at trial for substantive as well as impeachment purposes where the statement is signed by a declarant who has personal knowledge of the facts stated therein, testifies at trial, and is subject to cross-examination. Id., 753; see also *State* v. *Woodson*, 227 Conn. 1, 18–24, 629 A.2d 386 (1993) (tape-recorded statement satisfies writing requirement under *Whelan*); *State* v. *Alvarez*, 216 Conn. 301, 312–16, 579 A.2d 515 (1990) (same).

[8] McFadden, who had been standing approximately ten feet from the defendant at the time of the shootings, testified that he did not get a good

by the state, he testified consistently with his February, 1993 statement that the defendant had shot and killed Poole and Paisley, and had shot him in the arm. He further testified that he had lied in telling the police in 1991 that he had not seen the shooter. According to his testimony, he had lied because he did not know the whereabouts of the defendant and was afraid.

During cross-examination, the defendant asked Roach if he remembered speaking to Greene at the New Haven train station approximately one month before trial. Roach replied that he did. When the defendant asked Roach what Greene had said to him during that conversation, the state objected on hearsay grounds. Outside the presence of the jury, the defendant made an offer of proof that Roach had told Greene that he did not know who had killed Poole and Paisley because he had not seen the shooter. The defendant also sought to show that Roach had told Greene on another occasion, at a New Haven club, that he had not seen the shooter but that somebody had to pay the price for the shootings. The trial court ruled that the defendant could ask Roach only whether he had had a conversation with Greene "about the defendant's involvement in the case." When cross-examination resumed, the defendant asked Roach this question, and Roach answered in the negative. The defendant had no further questions for Roach.

On redirect examination, however, the state asked Roach about the content of his conversation with Greene at the train station. This time, the defendant

look at the gunman, and thus could not make a positive identification. Coleman and Higgins, who had been sitting in a car at the diner at the time of the shootings, identified the defendant as the shooter in statements they had given to the police. At trial, however, both women recanted their statements. Coleman's tape-recorded statement to the police and Higgins' written statement to the police were admitted at trial as substantive evidence against the defendant under the doctrine set forth in *State* v. *Whelan*, 200 Conn. 743, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986), and its progeny. See footnote 7.

objected, but the trial court overruled his objection. Roach answered that he had told Greene that he was in town visiting and that he had not discussed with her whether the defendant had shot the victims.

On recross examination, the defendant asked Roach about the content of his conversations with Greene. Roach denied having told Greene at the train station that he had not seen the shooter. Roach also denied having told Greene at the club that he had not seen the shooter but that someone had to pay the price for the shootings.

During the defense case, Greene was called as a witness. When the defendant asked Greene about the contents of her conversation with Roach at the train station, the state objected on hearsay grounds. During the defendant's offer of proof outside the presence of the jury, Greene testified that Roach had told her at the train station that he did not know who shot the victims because he had not seen the shooter. Greene also testified that Roach had told her at the club that he had not seen what had happened, but that "[s]omebody has to pay the price. Somebody has to go." The trial court sustained the state's objection to Greene's testimony on the basis that it was extrinsic evidence on a collateral matter.

On appeal, the defendant argues that Greene's testimony was admissible as extrinsic evidence of a prior inconsistent statement offered to impeach Roach's testimony identifying the defendant as the shooter.[9] The defendant contends that, in the circumstances of this case, the court abused its discretion in excluding

---

[9] The defendant also argues that Greene's testimony was admissible to show that Roach's identification of the defendant was motivated by revenge. Because we conclude that the testimony was admissible as extrinsic evidence offered to impeach Roach on a noncollateral matter, we need not address this additional argument.

Greene's testimony, and that this error was harmful. We agree.

As a general rule, extrinsic evidence of a prior inconsistent statement may not be admitted to impeach the testimony of a witness on a collateral matter. *State* v. *Colton*, 227 Conn. 231, 247, 630 A.2d 577 (1993). Thus, on cross-examination, a witness' answer regarding a collateral matter is conclusive and cannot be contradicted later by extrinsic evidence. Id., 248; C. Tait & J. LaPlante, Connecticut Evidence (2d Ed. 1988) § 7.24.4, p. 211; 1 C. McCormick, Evidence (4th Ed. 1992) § 49, pp. 182–83. Extrinsic evidence of a prior inconsistent statement may be admitted, however, to impeach a witness' testimony on a *noncollateral* matter. *State* v. *Colton*, supra, 247; *State* v. *Burns*, 173 Conn. 317, 327, 377 A.2d 1082 (1977); 1 C. McCormick, supra, § 36, p. 118 and § 49, p. 183. A matter is not collateral if it is relevant to a material issue in the case apart from its tendency to contradict the witness. *State* v. *McCarthy*, 197 Conn. 166, 176, 496 A.2d 190 (1985) (police testimony that witness was given methadone prior to confession was material where witness claimed he was suffering from withdrawal symptoms at time of confession); *State* v. *Burns*, supra, 327 (police testimony that defendant admitted being involved in confrontation with member of victim's boating party on night of victim's attempted rape was material in placing defendant at marina near time of crime); see also 1 C. McCormick, supra, § 36, p. 118 ("to impeach by extrinsic proof of prior inconsistent statements, the statements must have as their subject facts relevant to the issue in the cause"); id., § 49, pp. 183, 186; C. Tait & J. LaPlante, supra, § 7.24.4, pp. 210–11. The determination of whether a matter is relevant to a material issue or is collateral generally rests within the sound discretion of the trial court. *State* v. *Colton*, supra, 247; *State* v. *Burns*, supra, 327–28.

The central issue in the present case was the identity of the person who shot Roach and killed Poole and Paisley. Roach's statements to Greene, in which he allegedly stated that he had not seen what had happened on the night of the murders, did not know who had shot the victims, and that someone had to pay the price for the shootings, were inconsistent with his trial testimony. The subject matter of these statements, namely, the identity of the shooter and whether Roach knew that identity, was material to the central issue in the case and, therefore, was not collateral. We conclude that the trial court abused its discretion in excluding Greene's testimony.

To require the reversal of a conviction because of evidentiary error, the defendant must show that the error was harmful, i.e., that it is more probable than not that the erroneous ruling of the trial court affected the result. *State* v. *Moody*, 214 Conn. 616, 629, 573 A.2d 716 (1990). We conclude that the exclusion of Greene's testimony was harmful for the following reasons. First, Greene's testimony, if believed by the jury, seriously would have undermined Roach's in-court testimony identifying the defendant as the shooter. Second, Roach, who was shot after he had approached the car and was leaning toward the driver's side window, was the eyewitness who was best situated to identify the shooter. Finally, Roach was the only witness to give live testimony that the defendant was the shooter. The only other identification evidence came from the statements given by Coleman and Higgins to the police, which were recanted at trial. Roach's credibility on the central issue of the shooter's identity was, therefore, critical to the outcome of the case.

The state argues that the exclusion of Greene's testimony was harmless in light of substantial other evidence admitted at trial attacking Roach's credibility. The state first points to the fact that Roach admitted

on the stand that he had lied in his original statements to the police. The fact that Roach admitted lying is undermined as a significant factor to render the ruling harmless because the *effect* of that admission—that he lied when he said he could not identify the defendant—was simply to buttress his in-court identification of the defendant as the shooter. Moreover, although Roach admitted on the stand that he had made the prior statements to the police, he denied having made the prior statements to Greene. The state also points to the fact that Roach admitted that the first time he had identified the defendant was after the state had dropped criminal charges against him in an another case.[10] We conclude, however, that although Roach's admission did present a basis for the jury to disregard his testimony because of bias, it is insufficient to outweigh the other, more persuasive factors supporting our conclusion that the exclusion of Greene's testimony was harmful.[11]

## II

The defendant next claims that the trial court violated his federal and state[12] constitutional rights to confrontation by unduly restricting his cross-examination of Roach regarding criminal charges brought against Roach in another case. The state counters that the defendant was permitted sufficient cross-examination regarding those charges to meet the constitutional requirements, and that the trial court acted within its discretion in excluding further details of the criminal case against Roach. We agree with the state.

---

[10] See discussion in part II of this opinion.

[11] Although this conclusion requires a new trial, we consider the defendant's remaining claims to the extent that they are likely to arise at retrial.

[12] Because the defendant does not present an independent state constitutional analysis of this claim, we confine our analysis to federal constitutional law. See *State* v. *Perez*, 218 Conn. 714, 723, 591 A.2d 119 (1991).

At trial, Roach admitted that he had been arrested for an incident that had occurred on October 5, 1991, in which the complainant had been Tyrone Adams.[13] He testified that he had been charged with one count of attempted assault in the first degree, two counts of reckless endangerment in the first degree, one count of unlawful discharge of a firearm, and one count of illegal use of a firearm. He testified further that, if convicted, he would have faced a mandatory minimum sentence of five years and a maximum of twenty-seven years and three months imprisonment. Roach stated that he had been extradited from Georgia to face these charges in Connecticut. He admitted that these charges had been dropped two months after he had made a formal statement to the police identifying the defendant as the shooter in the present case. Roach testified that he had received no promises from the state in exchange for his testimony.

The defendant challenges two of the trial court's rulings prohibiting him from asking Roach about the details of the October 5, 1991 incident. The first occurred when the defendant asked Roach if "the first time you ever [identified the defendant as the shooter] was when you were in jail, facing twenty-seven years of charges for having shot up [Tyrone Adams'] house?" The second occurred when the defendant asked Roach: "Wasn't a good friend of yours, Charlie Soltez, arrested at the scene [on] October 5, 1991, at Tyrone Adams' house?" The state objected to both of these questions, and the trial court sustained the objections.

On appeal, the defendant argues that he was entitled to cross-examine Roach regarding his motive for coop-

---

[13] Adams was charged separately in the shooting deaths of Poole and Paisley. He was convicted of aiding and abetting manslaughter in the first degree in violation of General Statutes §§ 53a-8 and 53a-55 (a) (1). The judgment of conviction was affirmed on appeal. See *State* v. *Adams*, 235 Conn. 473, 667 A.2d 796 (1995).

erating with the police and, therefore, that he should have been allowed to elicit the details underlying the criminal charges brought against Roach. The defendant asserts that he should have been permitted to demonstrate the strength of the state's case against Roach in order to show that Roach had a correspondingly strong motive for cooperating with police in the present case. We disagree.

"The sixth amendment to the [United States] constitution guarantees the right of an accused in a criminal prosecution to confront the witnesses against him." (Internal quotation marks omitted.) *State* v. *Colton*, supra, 227 Conn. 248–49. "The primary interest secured by confrontation is the right to cross-examination; *Douglas* v. *Alabama*, 380 U.S. 415, 418, 85 S. Ct. 1074, 13 L. Ed. 2d 934 (1965); and an important function of cross-examination is the exposure of a witness' motivation in testifying. *Greene* v. *McElroy*, 360 U.S. 474, 496, 79 S. Ct. 1400, 3 L. Ed. 2d 1377 (1959). Cross-examination to elicit facts tending to show motive, interest, bias and prejudice is a matter of right and may not be unduly restricted. *State* v. *Lubesky*, 195 Conn. 475, 481–82, 488 A.2d 1239 (1985). In order to comport with the constitutional standards embodied in the confrontation clause, the trial court must allow a defendant to expose to the jury facts from which the jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness. *Davis* v. *Alaska*, 415 U.S. 308, 318, 94 S. Ct. 1105, 39 L. Ed. 2d 347 (1974) . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Santiago*, 224 Conn. 325, 331, 618 A.2d 32 (1992). In determining whether cross-examination was unduly restricted, the entire cross-examination must be examined. *State* v. *Asherman*, 193 Conn. 695, 721, 478 A.2d 227 (1984), cert. denied, 470 U.S. 1050, 105 S. Ct. 1749, 84 L. Ed. 2d 814 (1985). Once the defendant has been permitted cross-examination

sufficient to satisfy the sixth amendment, restrictions on the scope of cross-examination are within the sound discretion of the trial judge. *State* v. *Jones*, 205 Conn. 638, 670, 534 A.2d 1199 (1987).

In the present case, the defendant acknowledges that the jury was made aware of the charges against Roach. Furthermore, Roach admitted that he had identified the defendant as the shooter only after he had been extradited from Georgia and charged with several criminal offenses that exposed him to more than twenty-seven years imprisonment. He also admitted that these charges had been subsequently nolled. We conclude that the defendant's cross-examination of Roach was sufficient to comport with the constitutional standards embodied in the confrontation clause.

We turn, therefore, to the question of whether the trial court abused its discretion in excluding the details of the incident underlying the criminal charges against Roach. The defendant argues that he should have been allowed to demonstrate the strength of the evidence against Roach by exposing the details of the incident and Roach's knowledge of the evidence against him. We agree with the trial court that the admission of this type of evidence would have resulted in a mini-trial on the collateral case against Roach, with the defendant attempting to show the strength of the case and the state attempting to show its weakness. See *State* v. *Joly*, 219 Conn. 234, 258–62, 593 A.2d 96 (1991). We conclude that the trial court did not abuse its discretion in limiting the defendant's cross-examination of Roach regarding such facts.

III

The defendant next claims that the trial court improperly excluded Higgins' videotaped statement in which she admitted lying to the police. The defendant argues that the exclusion of this evidence violated his federal

and state[14] constitutional rights to confrontation and due process, and violated state evidentiary rules. We disagree.

The following additional facts are relevant to this claim. On September 26, 1991, Higgins gave a statement[15] to the police essentially as follows. At the time of the murders, she was sitting with two friends in a car parked at the diner and could see the front of the diner from that vantage point. The defendant was near the front steps of the diner when Higgins saw him pull out a gun and start shooting. While he was shooting, a nearby car started its engine. The defendant ran and jumped into the passenger seat of that car, which then sped away. In this statement, Higgins positively identified the defendant as the shooter. She stated that she knew the defendant from having dated one of his friends. She also identified the defendant from a photographic array.

At trial, Higgins recanted her statement during direct examination by the state. She testified that she had not seen the shootings because she had arrived at the diner after the shootings had occurred. She admitted having given the statement to the police, but she said that it had been a lie. She testified that she had lied because the police had given her $50, had threatened to lock her up on an outstanding arrest warrant if she did not cooperate, and had promised to "take care of" her warrant in exchange for her statement. The state later introduced her prior written statement to the police for both substantive and impeachment purposes under *State* v. *Whelan*, 200 Conn. 743, 753, 513 A.2d 86, cert. denied,

---

[14] Because the defendant does not present an independent state constitutional analysis of this claim, we confine our analysis to federal constitutional law. See *State* v. *Perez*, 218 Conn. 714, 723, 591 A.2d 119 (1991).

[15] This statement was transcribed and subsequently signed by Higgins on October 1, 1991.

479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986).
See footnote 7.

On cross-examination, Higgins testified again that she had lied to the police in identifying the defendant as the shooter. She testified that she had lied because of police inducements and threats. The defendant then asked Higgins if she had given a statement to the defendant's investigator on March 8, 1994, shortly before trial. The state objected on hearsay grounds. During an offer of proof, the defendant produced a videotaped statement of Higgins, taken on March 8, 1994, at his defense counsel's law office, in which Higgins had claimed that her statement to the police had been a lie. The defendant argued that the videotaped statement was being offered as a prior consistent statement to rehabilitate Higgins' trial testimony and, in the alternative, as a prior inconsistent statement to impeach Higgins' *Whelan* statement. The trial court sustained the state's objection to the videotape.

On appeal, the defendant first argues that the exclusion of Higgins' videotaped statement violated his confrontation rights by precluding him from showing that Higgins was motivated to lie to the police due to police pressure. The defendant admits, however, that Higgins testified that the police had threatened her with jail, and had promised to give her money and to take care of her outstanding warrant in exchange for her statement. Under these circumstances, we conclude that the defendant was permitted sufficient cross-examination into Higgins' alleged motive to cooperate with the police when she gave them her statement on September 26, 1991.

The defendant next argues that exclusion of the videotaped statement violated state evidentiary rules. The parties disagree about which evidentiary rules govern the admissibility of Higgins' videotaped statement. The

defendant argues that the trial court should have applied the rules regarding impeaching a witness with a prior *inconsistent* statement, because Higgins' videotaped statement was inconsistent with her statement to the police. The defendant reasons that, because Higgins' statement to the police was admitted as substantive evidence under *State* v. *Whelan,* supra, 200 Conn. 743, the defendant should have been able to "impeach" that statement with a prior inconsistent statement, just as one can impeach testimony at trial with a prior inconsistent statement. The state responds that the trial court properly applied the rules regarding rehabilitating a witness with a prior *consistent* statement because Higgins' videotaped statement was consistent with her testimony on direct examination. We conclude that, although Higgins' videotaped statement was inconsistent with her *Whelan* statement, it was consistent with her testimony at trial that she had lied to the police and, therefore, that the rules regarding the admissibility of prior consistent statements applied. To hold otherwise would undermine the purpose underlying the more restrictive rules governing the use of prior consistent statements, while not furthering the purpose underlying the rules governing the use of prior inconsistent statements.

"It is fundamental that for the purpose of impeaching the credibility of his testimony, a witness may be cross-examined as to statements made out of court or in other proceedings which contradict those made upon direct examination. . . . This is based on the notion that talking one way on the stand, and another way previously, raises a doubt as to the truthfulness of both statements." (Citations omitted.) *State* v. *Saia,* 172 Conn. 37, 45, 372 A.2d 144 (1976). "The purpose of impeachment is to undermine the credibility of a witness so that the trier will disbelieve him and disregard his testimony." (Internal quotation marks omitted.) *State* v. *Torres,* 210 Conn.

631, 641, 556 A.2d 1013 (1989). In the present case, it is important to note the order of Higgins' testimony. She first testified on direct examination that she had not been at the diner at the time of the shootings, had not seen the shooter , and thus did not know the identity of the shooter. She admitted to having told the police that she had witnessed the shootings and that the defendant had been the shooter, but testified that her statement to the police had been a lie. The state then introduced Higgins' statement to the police as a prior inconsistent statement for both impeachment and substantive purposes under *State* v. *Whelan,* supra, 200 Conn. 743. Thus, the purpose of impeachment was met by showing the contradiction between her testimony on direct examination and her *Whelan* statement.

When the defendant sought to introduce the videotaped statement in which Higgins admitted lying to the police, however, he was attempting to introduce a statement, the principal effect of which would have been to buttress Higgins' trial testimony that she had lied to the police. Because the principal effect of the videotaped statement would have been simply to bolster Higgins' credibility by the use of a prior statement consistent with her trial testimony, the rules governing the use of a prior consistent statement applied.

As a general rule, a witness' prior consistent statements are inadmissible at trial. *State* v. *Pollitt,* 205 Conn. 61, 76, 530 A.2d 155 (1987); *State* v. *Anonymous (83–FG),* 190 Conn. 715, 728, 463 A.2d 533 (1983); *State* v. *Brown,* 187 Conn. 602, 607, 447 A.2d 734 (1982); *State* v. *McCarthy,* 179 Conn. 1, 18, 425 A.2d 924 (1979); *Thomas* v. *Ganezer,* 137 Conn. 415, 417, 78 A.2d 539 (1951); see annot., 59 A.L.R.4th 1017 (1988). "Such statements clearly are barred by the hearsay rule if sought to be used to prove the truth of the matters asserted therein . . . also, they generally are prohibited even when offered for the limited purpose of rehabilitating

the witness' damaged credibility. . . . The rationale upon which this rule is based is that the witness' story is not made more probable or more trustworthy by any number of repetitions of it." (Citations omitted; internal quotation marks omitted.) *State* v. *Dolphin*, 178 Conn. 564, 568–69, 424 A.2d 266 (1979).

This rule, however, is not absolute. The trial court, within its discretion, may admit a prior consistent statement if offered to rehabilitate a witness who has been impeached by a prior inconsistent statement; see, e.g., *State* v. *McCarthy*, supra, 179 Conn. 18–21; by the suggestion of bias, motive, or interest arising after the time the prior consistent statement was made; see, e.g., *State* v. *Dolphin*, supra, 178 Conn. 571–72; by a claim of recent fabrication; see, e.g., *State* v. *Pollitt*, supra, 205 Conn. 77; or by a claim of faulty memory. See, e.g., *State* v. *Anonymous (83–FG)*, supra, 190 Conn. 729; see generally *State* v. *Brown*, supra, 187 Conn. 608 (summary of rule and exceptions). When a prior consistent statement is admitted under any of these exceptions, it is admitted to affect credibility only and not to establish the truth of the statement. *State* v. *McCarthy*, supra, 18.

In the present case, the first exception applied because the defendant attempted to rehabilitate Higgins' trial testimony after it was impeached by her *Whelan* statement. The trial court was well within its discretion, however, in excluding the videotaped statement in light of the fact that the videotape was made shortly before trial and more than two years after the shootings. Furthermore, it was made after the impeaching statement, namely, Higgins' statement to the police, had been made. Under these circumstances, the trial court was within its discretion in considering the videotaped statement to be a classic example of a statement that "suffered from a serious element of self-interest" in which the witness attempted to bury her inconsistent statement with a later consistent one. See

C. Tait & J. LaPlante, supra, § 7.28.3. Because none of the other exceptions to the general rule applied, we conclude that the trial court did not abuse its discretion in excluding Higgins' videotaped statement.[16]

The defendant next argues that the trial court violated his constitutional right to due process by allowing the state to introduce Higgins' out-of-court statement to the police, while precluding the defendant from introducing her out-of-court videotaped statement. In support of this argument, the defendant cites *State* v. *Torres*, supra, 210 Conn. 631. In *Torres*, the state's key identification witness was unavailable at trial, and the transcript of his testimony from the probable cause hearing was read to the jury. Because the witness was unavailable to testify, impeachment could be accomplished only through the introduction of the witness' prior out-of-court statements. The trial court restricted the defendant's use of prior inconsistent statements to those made after the probable cause hearing, but allowed the state to use prior consistent statements made both before and after the probable cause hearing. Under those circumstances, this court held that the exclusion of the defendant's proffered inconsistent statements was not evenhanded and thus violated his due process right to a fair trial. Id., 643. *Torres* is inapposite, however, because in the present case Higgins testified at the trial and underwent extensive cross-examination. Furthermore, there was no question that Higgins' statement to the police was properly introduced under *State* v. *Whelan*, supra, 200 Conn. 743. The only question was whether the trial court abused its discretion in precluding the defendant's use of the videotaped statement, which was consistent with Higgins' in-court testimony,

---

[16] The defendant also claims that the trial court improperly excluded the testimony of a defense witness, Paul Brock, who stated that Higgins had told him some time after the murders that she had lied to the police. We reject that claim for the same reasons.

to rehabilitate her credibility. Having already answered this question in the negative, we reject the defendant's final argument.

## IV

The defendant next claims that the trial court improperly denied his motion to dismiss, which was based on the police department's failure to preserve a photograph of someone identified by McFadden as having features similar to those of the shooter. The defendant argues that his federal and state constitutional rights to due process were violated by the failure of the police to preserve this photograph. We disagree.

The following additional facts are relevant to our disposition of this claim. McFadden was at the diner at the time of the shootings and testified at trial as follows. He saw a scuffle take place in the lobby of the diner. One of the men involved left the diner and returned later with another man. When the two men returned, the fight resumed on the front steps of the diner. At one point, McFadden attempted to break up the fight but was pushed away. He then heard one of the men yell to his friend to shoot. The gunman then shot the two victims. McFadden was approximately ten feet away from the gunman when this occurred. The gunman then ran to a waiting car and jumped into its passenger seat. When Roach approached the car, the gunman stuck a gun out of the driver's side window and shot Roach in the forearm. McFadden described the gunman as dark skinned, having a full beard and a high-low haircut, which was faded to the side, and wearing a burgundy sweatshirt and jeans.

On October 2, 1991, eleven days after the shootings, McFadden gave a statement[17] to the police relating the previously described events. While he was at the police

---

[17] This statement was transcribed and subsequently signed by McFadden.

station, McFadden looked through several trays of approximately 100 photographs each in an attempt to identify the shooter. Included in the photographic array was an old photograph of the defendant, whom McFadden knew prior to the shootings. McFadden passed over the defendant's photograph. He then selected one of the photographs as depicting a man with features similar to those of the shooter, such as a full beard, dark skin and a high-low haircut. He said that the person in the photograph "favors [the shooter] somewhat," but that he could not make a positive identification because he did not "get a good look at" the shooter's face.[18] McFadden did not sign this photograph, and the police did not preserve it. Several days later, McFadden was shown a second photographic array at his home. Again, the defendant's photograph was in the array, and McFadden passed over it. McFadden said that none of the individuals in the array looked like the shooter.

At trial, the defendant moved to dismiss the charges against him, claiming that his federal and state constitutional due process rights were violated by the failure of the police to preserve the photograph of the individual identified by McFadden as having features similar to those of the shooter. The trial court denied the defendant's motion.

On appeal, the defendant claims that the failure of the police to preserve this photograph violated both his federal and state constitutional rights to due process. Because the record contains no evidence of bad faith on the part of the police in failing to preserve the photograph, as required under the federal standard set forth in *Arizona* v. *Youngblood,* 488 U.S. 51, 109 S. Ct. 333,

---

[18] When the detective conducting the photographic array later asked McFadden if he was able to identify anyone in the photographs as the gunman, McFadden replied: "Somewhat, I thought I did. I picked out someone." The detective then asked if he positively identified the person he picked out as the shooter, and McFadden replied: "No."

102 L. Ed. 2d 281 (1988), we focus our analysis on the defendant's state constitutional claim.

We have recently enunciated the standard for determining whether the failure of the police to preserve evidence constitutes a due process violation under our state constitution. In *State* v. *Morales*, 232 Conn. 707, 727, 657 A.2d 585 (1995), we rejected the federal standard of *Arizona* v. *Youngblood*, supra, 488 U.S. 51, and held that, under our state constitution, the good or bad faith of the police in failing to preserve potentially useful evidence cannot be dispositive of whether a criminal defendant has been deprived of due process of law. "Rather, in determining whether a defendant has been afforded due process of law under the state constitution, the trial court must employ the *Asherman*[19] balancing test, weighing the reasons for the unavailability of the evidence against the degree of prejudice to the accused. More specifically, the trial court must balance the totality of the circumstances surrounding the missing evidence, including the following factors: the materiality of the missing evidence, the likelihood of mistaken interpretation of it by witnesses or the jury, the reason for its nonavailability to the defense and the prejudice to the defendant caused by the unavailability of the evidence." (Internal quotation marks omitted.) *State* v. *Morales*, supra, 726–27. Applying these factors to the present case, we conclude that the defendant's due process right under our state constitution was not violated by the failure of the police to preserve the photograph of the individual identified by McFadden as having features similar to those of the shooter.

First, the photograph was not material. The measure of materiality is whether "there is a reasonable probability that, had the evidence been disclosed to the defense,

[19] *State* v. *Asherman*, supra, 193 Conn. 724.

the result of the proceeding would have been different." (Internal quotation marks omitted.) *State* v. *Baldwin*, 224 Conn. 347, 365, 618 A.2d 513 (1993). In the present case, McFadden repeatedly testified that he did not get a good look at the shooter's face and had been unable to make a positive identification from the photograph. At best, he was only able to say that the man depicted in the photograph had some features similar to those of the shooter. In light of these circumstances, we cannot conclude that the presence of the photograph at trial would have been sufficient to cast reasonable doubt on the defendant's guilt. See, e.g., *State* v. *Amarillo*, 198 Conn. 285, 298–99, 503 A.2d 146 (1986) (photograph selected by witness as resembling perpetrator not material where witness could not make positive identification from it).

Second, there was little likelihood of mistaken interpretation of the photograph. The defendant concedes this point in his brief. The defendant was able to question McFadden and the detective who conducted the photographic array about the array procedure and McFadden's inability to make a positive identification.

Third, the reason the photograph was not preserved was that McFadden was unable to make a positive identification from it and could only identify some similar features. There was no evidence of bad faith or even negligence on the part of the police in failing to preserve the photograph. Because a properly conducted array should contain photographs of individuals who resemble the accused, many photographs in a properly constituted array would have to be preserved under the defendant's analysis, so long as the witness notes the similarity of features. The constitution does not require such extensive preservation.

Finally, any prejudice to the defendant was minimal. The jury knew that McFadden had selected the photo-

graph of a person whom he could not positively identify as the shooter, but who had some features similar to those of the shooter. McFadden testified that the similar features were a full beard, a high-low haircut and dark skin. More importantly, the jury knew that the missing photograph was not that of the defendant. The jury knew that McFadden had known the defendant before the shootings and had passed over the defendant's photograph in both arrays. In light of all the circumstances, we conclude that the defendant's state constitutional right to due process was not violated by the failure of the police to preserve this photograph. The trial court, therefore, properly denied the defendant's motion to dismiss.

V

The defendant's final three claims are that the trial court improperly: (1) excluded McFadden's statement to the police; (2) excluded hearsay testimony regarding Coleman's alleged bias toward the police; and (3) questioned Coleman during cross-examination in violation of the defendant's rights to a fair and impartial trial and to due process. After having examined the record, we are convinced that it is not likely that these issues will arise at retrial. We therefore need not review these claims.

The judgment is reversed and the case is remanded for a new trial.

In this opinion CALLAHAN, C. J., and BERDON and PETERS, Js., concurred.

MCDONALD, J., dissenting in part. The majority finds harmful error in the trial court's refusal to admit the testimony of Crystal Greene, a friend of the defendant, Daryl Valentine, concerning the contents of conversations she claims to have had with Christopher Roach. Roach was the witness who identified the defendant as

the person who, on September 21, 1991, fatally shot his two friends, Andrew Paisley and Hury Poole. In the aftermath, as Roach pursued the defendant and reached into the car in which the defendant was leaving, Roach himself was shot twice in the right forearm.

The jury heard evidence, some of which was tape-recorded, that after the shootings Roach repeatedly had told the police that he could not identify the killer. Only later when he was in police custody for a subsequent altercation with one of the defendant's associates, Tyrone Adams, and facing serious charges, did he identify the defendant. He directly admitted to the jury that he had lied to police and that he had done so "through [his] teeth."

The majority orders a new trial on the ground that the trial court improperly excluded the testimony of Greene. Greene was a friend of the defendant and an in-law of Roach. She would have testified that, on two specific occasions in March, 1994, Roach told her that he had not seen what happened and, on the second occasion, also stated: "Somebody has to pay the price. Somebody has to go." On cross-examination, Roach denied making these statements on those occasions. He denied having any conversations with Greene on those occasions about the defendant's involvement in the murders.

Greene did testify before the jury that she had a conversation with Roach on those two occasions regarding the defendant's involvement, but she was not permitted to repeat Roach's words. I agree with the majority that her testimony should have been admitted. I part company, however, with the majority as to the effect at trial of the ruling excluding this testimony in this long trial. The majority here declines to find harmless error and orders a new trial.

In practical terms, the contents of the conversations had been put before the jury during the cross-examination of Roach. Initially, Roach denied having any conversation at his two meetings with Greene concerning the defendant's involvement in the murders. Defense counsel then asked Roach if he had had the two conversations with Greene and incorporated the very contents of the alleged conversations into the questions, the exclusion of which he claims resulted in harmful error. Roach again denied having those conversations. When Greene later testified that she did have conversations on those two occasions with Roach about the defendant's involvement in the murders, very little was left to the jury to conclude as to their contents. Although it was improper not to allow Greene to testify as to the contents of the conversations, in these circumstances, I cannot detect the harmful error found by the majority.

Other factors should also be considered as to whether the trial court's ruling was harmful. Roach did admit on the stand that he lied to the police investigators repeatedly about seeing the man who killed his two friends and wounded him. The evidence showed that Paisley and Poole were on either side of Roach when each was shot in the chest. The defendant then shot Roach twice in the forearm, at close range, while they were face to face across the front seat of the automobile in which the defendant fled. Roach was reaching into the driver's side when the defendant pushed the driver aside and shot Roach from the front passenger seat. There was evidence that Paisley, Poole and Roach were all shot by the same gun, that Roach put up his forearm to protect himself when he was shot and that the killer was a few feet from all the victims when he shot them. In view of the likelihood that Roach did see who shot him and his friends, his repeated and direct admissions of lying to the police and the practical effect of Greene's testimony, I see no reason to order a new trial.

The doctrine of harmless error is a very elastic one. It has been adopted by courts to avoid ordering new trials because of judicial errors that would not have a substantial impact on the truth finding process and result in an injustice. See *State* v. *Negron*, 221 Conn. 315, 328–29 n.12, 603 A.2d 1138 (1992); *State* v. *Jones*, 205 Conn. 723, 732, 535 A.2d 808 (1988). I do not believe the excluded testimony would seriously undermine Roach's testimony, as the majority concludes.

The practical effect of this ruling in the trial before the jury was not substantial and I would not order a new trial.

Although I concur with the remaining parts, I respectfully dissent from part I of the majority opinion.